[S. F. No. 22621.   In Bank.   May 28, 1969.]

THOMAS J. CLANCY, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

Daniel H. Dibert and Stubbs & Dibert for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of a disciplinary board of the State Bar that petitioner be suspended from the practice of law for three years, on conditions of probation, including actual suspension for the first six months, and compliance with other terms of probation.

*Facts*: Petitioner, now 36 years of age, was admitted to practice in this state in 1961. He was charged in a notice to show cause with professional misconduct in violation of his oath and duties as an attorney at law (Bus. & Prof. Code,

§§ 6103, 6067, 6068) and the commission of acts involving moral turpitude (Bus. & Prof. Code, § 6106) in requesting a client to deliver $1,000 to him on his representation that he would invest the funds and make a profit of $200 for her, knowing that the representation was made for the purpose of inducing the client to make available $1,000 for petitioner's own purposes.

Petitioner did not file an answer to the notice to show cause. However, he appeared in person and by counsel at the hearing before the local administrative committee and stipulated that all the material allegations of the notice would be deemed denied.

The committee found petitioner culpable and recommended suspension for one year, with the suspension stayed on conditions of probation providing that if within the first six months he repaid his client $1,200 the order suspending him would be revoked as of the date of payment and if he failed to make such payment within the first six months he would be suspended for the remaining six months.

Petitioner conditionally accepted the report of the trial committee, pursuant to rule 38.5 of the Rules of Procedure of the State Bar. The disciplinary board rejected petitioner's conditional acceptance and ordered the proceeding calendared for review. After argument on the merits, the disciplinary board made findings of fact that differed in minor respects from those of the trial committee, and unanimously found petitioner culpable. The board, by a vote of 8 to 5, recommended that petitioner be suspended from practice for three years on conditions of probation, including actual suspension for the first six months, further suspension to terminate upon repayment of $1,200 to his client, and in no event to exceed three years.[1] The five dissenting members of the board were of the opinion the discipline recommended was too severe.

---

[1] Other conditions of the three-year probationary period require petitioner to report monthly to the State Bar. In his first monthly report he is to certify that he has read the State Bar Act, the Rules of Professional Conduct of the State Bar of California and Canons of Professional Ethics of the American Bar Association and, if he is in possession of clients' funds, that he has deposited such funds in a bank or trust company, authorized to do business in California, in a bank account separate from his own account and clearly designated as ''Clients' Funds Account'' or ''Trust Funds Account,'' or words of similar import (identifying said bank account), that said funds continuously were maintained in said account until properly withdrawn on behalf of said clients, and that he has fully and correctly accounted for all such funds. In each subsequent monthly report he is to certify that he has complied with all the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar and if he is still in possession of clients' funds or, where

At the time of the hearing before the local administrative committee, Mrs. Ragsdale, the complaining witness, was a widow, aged 59 years, who had lived in California since 1945. She testified that she had only a first grade education. She had been employed as a maid in a San Francisco hotel for about 17 years and ceased working due to illness. She first met petitioner in 1962 when someone recommended that she consult him in connection with a personal injury claim. Her husband died in 1963, and petitioner handled the probate of his estate, from which she received approximately $10,000 on final distribution. He assisted her in obtaining a widow's pension from the Veterans Administration and drafted an agreement between her and a songwriter in Arizona. He also drafted her will, and she thereafter consulted him regarding some desired changes. She and petitioner sometimes conversed about their families; petitioner was kind to her; and she "thought of him as a brother, and he seemed like the best friend I had here."

On or about August 18, 1966, petitioner telephoned Mrs. Ragsdale at home and said that in going over her will he noticed she had a little money in the bank and inquired whether she would like to make a good investment. She testified that he told her "G.I. boys buy homes and the Government stands behind it, and if the boys can't pay for it, they want [their equity] out of it, and the place is put up and sold, and if they don't bring the price, the Government pays the difference. . . . he said [there] was a place down in Marin County and it was in excellent condition, and the people wanted a thousand dollars for that [equity]." She asked petitioner whether she could lose her money, and he "guaranteed" that she couldn't lose, as "the Government stands back of it." He told her she would receive no interest, but she would get back her $1,000 in 90 days and make anywhere from $50 to $500 profit when the house was sold. She told him she wanted to think it over and asked him to call her again. When petitioner telephoned her later that day she asked him how he wanted the money and he told her to have a check made out to him. She withdrew $1,000 from her savings account, delivered it to petitioner at his office, and he gave her a receipt for the money. The document she denominated as "a

entitled to practice law, has come into posession thereof during the period covered by the report, that he has deposited such funds in a bank or trust company as above described (identifying said bank account), that said funds continuously were maintained in said account until properly withdrawn on behalf of said clients, and that he has fully and correctly accounted for all such funds.

receipt'' was petitioner's unsecured, 90-day, noninterest bearing note.

Several weeks later, on or about September 30, 1966, petitioner telephoned her saying that he had ''good news'' for her, ''we sold the place and you made $200.'' At the same time he told her that she could pick up her new will at any time, but that it would be four or five weeks before he could ''fix the deeds and things'' and have a check for her.

Mrs. Ragsdale executed her will at petitioner's office on September 30, 1966. Hearing nothing further from petitioner for several weeks, she telephoned his office and received a recorded message that the telephone number was no longer in service. She went to his office, where she learned that petitioner had moved out. She was unable to locate him and did not see him again until the hearing. In the meantime she had not heard from him, nor had she received either the return of her $1,000 or the promised profit.

Petitioner denied having represented to his client that he would invest her money in a G.I. mortgage, and said he obtained $1,000 from her, intending to repay that amount plus a bonus in a then undetermined amount upon receipt of an anticipated fee from another client. Petitioner testified that he had earned, but had not received, a fee of about $2,500 for representing a mortgage broker in an action to recover a commission for negotiating a loan to refinance an office building. A number of other lawsuits, including a foreclosure, were pending against the owner of the building. Funds from the new lender were held in escrow, from which the various claims were to be paid. Petitioner attached part of the funds for the broker's commission. After a settlement had been reached among the various claimants, the Franchise Tax Board placed a withholding order with the escrow holder for a claim against the former owner of the building, further delaying the escrow closing. The tax lien was eventually removed, and in an interpleader action the court ordered the funds paid to the county clerk to be disbursed pursuant to a stipulation. While the funds were in the hands of the county clerk, an attachment was filed by another party, and at the time of the hearing before the local administrative committee petitioner had not received his fee.

It was during the period that petitioner awaited the release of the tax lien that he telephoned Mrs. Ragsdale and asked for, and obtained, a thousand dollars. He was in an extremely difficult financial position, partly due to his wife's pending divorce action, and was unable to borrow from anyone else,

although he did not so inform Mrs. Ragsdale. He gave her a 90-day note because he would need that amount of time to repay the thousand dollars in the event he did not receive his expected fee. He was quite sure he did not describe the note to her as "a receipt." When questioned whether he represented to his client that he was going to make an investment for her, he answered: "I did not represent that I would invest that money for her, no. But insofar as her viewing this as an investment, clearly yes. The whole connotation of it was an investment which she would be repaid more than interest. Q. In other words, an investment in you, not in some other mortgage or in any other venture? A. Well, in me and in the funds that were to come to me."

When questioned by one of the committee members as to what he said to Mrs. Ragsdale, he replied: "I said to her that I was anticipating receiving a substantial fee when this property was closed, that if she would advance or put up (and I don't know my words) a thousand dollars, that in a very short period of time, I would return that to her, plus a profit. She could look at it as an investment. That, in essence, is it." When asked whether the fee he was expecting would have been sufficient to pay all of his creditors, he replied that it would not have been sufficient to pay them all in full but it was his intention to repay Mrs. Ragsdale.

Petitioner used the funds obtained from Mrs. Ragsdale for his personal expenses and to discharge some of his debts. He gave up his office about November 1, 1966, and sold his furnishings to pay back rent. He was unable to find employment until September 1967, and made no attempt to contact Mrs. Ragsdale after she executed her will at his office. He notified the post office of a change of address and received mail forwarded from the office. He stated that the attorneys at his former office knew where to locate him; he surmised that one of the girls at the office, knowing his problems with creditors, may have felt she was doing him a favor in not disclosing his forwarding address to Mrs. Ragsdale.

The day before the hearing petitioner delivered $200 to his counsel in trust for Mrs. Ragsdale, but this sum was not turned over to her on advice of his counsel.

In summary, the board found (I) that by reason of petitioner's prior representation of Mrs. Ragsdale he was familiar with her lack of formal education, her financial condition, her trust and confidence in him, and the fact that she had inherited funds from her deceased husband; (II) that at a time

when he was in straitened financial circumstances he communicated with her for the purpose of obtaining funds from her for his personal use and, although aware of her concern for the safety of her money, he failed to disclose to her the nature of his then existing financial difficulties, his desire to obtain the funds for his personal use, and his inability to procure funds for this purpose from other sources; (III) that in reliance upon petitioner's representations, Mrs. Ragsdale withdrew $1,000 from her savings account and paid said sum to him, for which she was given a noninterest bearing, 90-day promissory note as a ''receipt'' for her money rather than a note, she being ignorant of the nature and legal effect of the document given her; (IV) that Mrs. Ragsdale was thereafter informed by petitioner that the property in which she had invested her money had been sold, that she had earned $200, and that the money would be available to her in about four weeks; that she received no further information from him and discovered that he had moved from his office; and that petitioner wilfully failed to communicate with her and to make a fair disclosure of his inability to repay her; and (V) that petitioner used his position as an attorney for Mrs. Ragsdale and his knowledge of her lack of understanding of financial matters and her trust and confidence in him to obtain money from her fraudulently for his personal use without full, fair and truthful disclosure of the purpose for which the funds were to be used and of his then existing financial condition which, if it had been disclosed, would have thwarted his purpose in acquiring those funds.

The burden is upon one seeking review of a recommendation of a disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Simmons* v. *State Bar,* 70 Cal.2d 361, 364 [2] [74 Cal.Rptr. 915, 450 P.2d 291].) In the present case the record discloses that petitioner has not sustained this burden.

Petitioner concedes that Mrs. Ragsdale was his client when he obtained the $1,000. To her he owed the utmost good faith. (*Schullman* v. *State Bar,* 59 Cal.2d 590, 600 [5] [30 Cal.Rptr. 834, 381 P.2d 658].) The relationship between an attorney and client is a fiduciary relationship of the very highest character. All dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness. (*Marlowe* v. *State Bar,* 63 Cal.2d 304, 308 [6] [46 Cal.Rptr. 326, 405 P.2d 150].) It is incumbent upon the attorney to

show that the dealings are fair and reasonable and were fully known and understood by the client. The burden is on the attorney to show that the transaction between them was "at arm's length." (*Krieger* v. *State Bar*, 43 Cal.2d 604, 610 ▮ [275 P.2d 459].)

▮ Petitioner contends that neither the local administrative committee nor the disciplinary board specifically found that he made a false representation to his client at the time she parted with her money. He argues that there should have been a finding either (1) that Mrs. Ragsdale gave petitioner $1,000 to be invested for her in a real estate venture; or (2) that the $1,000 represented a loan, in which event it follows that no false representations were made, and if no false representations were made, he cannot be disciplined. We do not agree with petitioner that "the one crucial and determinative fact to be resolved" in this proceeding is what petitioner said to Mrs. Ragsdale. Rather, in our view, the fact that determines his culpability is what he left unsaid, i.e., his failure to disclose that he needed funds for his own use because of his pressing financial obligations and his inability to obtain funds elsewhere.

The finding that petitioner claims is deficient is quoted in the margin. The entire paragraph is the finding of the local committee; the bracketed portion was omitted by the board in its finding.[2] That part of the trial committee's finding that petitioner "testified that he advised Mrs. Ragsdale that he wished to borrow the sum of $1,000 from her" was properly omitted by the board for the reason that the transcript shows

---

[2]Finding II reads: "During the latter part of August 1966, Mrs. Ragsdale consulted Respondent for the purpose of drafting her Will. At this time Respondent was in straitened financial circumstances. Prior to the final preparation of this document, Respondent communicated with Mrs. Ragsdale by telephone for the purpose of obtaining funds from her for his own personal use. [Respondent testified that he advised Mrs. Ragsdale that he wished to borrow the sum of $1,000.00 from her and that this sum would be repaid to her from a fee which he anticipated receiving shortly upon the closing of a real estate escrow. Mrs. Ragsdale testified that Respondent represented to her that he knew of a real estate venture which could result in a profit to her, and that investment of her funds in this venture, in the sum of $1,000.00, would be secure. Despite the conflict in this testimony as to the nature of the representation made by Respondent to Mrs. Ragsdale, the Committee finds that] Respondent, although aware of Mrs. Ragsdale's concern for the safety of her money, failed to disclose to her the nature of his then existing financial difficulties, that he desired the funds for his own personal use, and that he was unable to procure funds for this purpose from other sources. Respondent in addition conceded that his financial difficulties were such that the fee which he expected to receive would not have been sufficient to discharge his pending personal obligations in full."

that at no time did petitioner unequivocally testify that he wished to borrow money from her.[3] The finding of both the trial committee and the disciplinary board was that petitioner communicated with Mrs. Ragsdale by telephone for the purpose of obtaining funds from her for his personal use and, although aware of her concern for the safety of her money, he failed to disclose to her the nature of his then existing financial difficulties; he failed to disclose that he desired the funds for his personal use; and he failed to disclose that he was unable to procure funds for this purpose from any other source.

The above facts are sufficient to support a finding that petitioner concealed adverse and material facts when he obtained the money from his client. In *Grove* v. *State Bar*, 63 Cal.2d 312 [46 Cal.Rptr. 513, 405 P.2d 553], it was held that concealment can mislead as effectively as a false statement. ''No distinction can therefore be drawn from among concealment, half-truth, and false statement of fact.'' (P. 315 [2].) There is therefore no merit to petitioner's contention that his misconduct does not warrant disciplinary action.

In *Krieger* v. *State Bar, supra,* 43 Cal.2d 604, the attorney was suspended for two years for recommending an investment in a certain corporation to his client without fully disclosing his superior knowledge of the corporation's financial condition. ''His active misrepresentation and concealment of the true nature of an investment which he, as an attorney, recommended to his client, constitute dishonesty and moral turpitude which make him subject to disciplinary action.'' (P. 609 [1].) Further, it was said: ''Petitioner contends that moral turpitude cannot be predicated upon errors of judgment made in good faith by an attorney. In view of his superior knowledge of the condition of [the company] . . . it was his duty to disclose such facts to her even in the absence of an attorney-client relationship. [Citation.] The evidence would support an implied finding that he acted in bad faith in recommending the investment, at a time when the company in which he was interested needed cash. . . . *Whether or not there was actual fraud there was misrepresentation and concealment of adverse and material facts.*'' (Italics added.) (P. 610 [6-7].)

---

[3] ''Q [by committee member]. You just telephoned this lady and said, 'Would you bring a thousand dollars down to my office, I want to borrow it'? A. As I recall, no, that was not the case. As I recall, I called and asked her for the money, and told her what the return would be. . . . Q. . . . Did you say, 'I want to borrow a thousand dollars from you; and if you will lend me a thousand dollars, I will do and so' [sic]? A. In essence, I wouldn't attempt to rephrase my words.''

In the present case petitioner testified that his client clearly viewed the transaction between them as an investment.

Even assuming that Mrs. Ragsdale misunderstood the nature of the investment petitioner offered her, and accepting petitioner's version that it was an investment in him and the funds that were coming to him, his own testimony shows that he did not fully explain the transaction to her. When asked if he informed her of the natue of the litigation causing the receipt of his fee to be delayed, he replied that he wasn't certain just what he did tell her about it; he believed that his "comments were very brief and very limited. I believe that Mrs. Ragsdale gave me the money because she had confidence in me and the fact that I would repay the money to her. I think the details were not gone into at all." He was asked by one of the committee members if he thought that Mrs. Ragsdale understood the intricacy of the litigation, to which he replied: "I'm certain she didn't at any time. I never thought she did," and he did not "discuss any of the intricacies with her." In a further attempt by the committee to ascertain whether petitioner had ever informed his client that he wanted to "borrow" a thousand dollars, or had ever asked her to "lend" him the money, he replied that he did so "in essence."

Petitioner cites *Wallis* v. *State Bar*, 21 Cal.2d 322 [131 P.2d 531], in support of his further argument that Mrs. Ragsdale was motivated not by any misrepresentation on his part but by her desire to make a high return on her capital. The *Wallis* case was compared and distinguished in *Krieger* v. *State Bar, supra,* 43 Cal.2d 604, 610-611: "Petitioner relies strongly upon *Wallis* v. *State Bar* . . . in which an attorney interested a former client in highly speculative transactions by promising her more profit than a prudent investor would expect, and his conduct was held not to justify disciplinary action under the State Bar Act. In each of the matters there concerned, the attorney directly solicited funds for himself as a principal and did not recommend any investment; his client had previous business experience; and she did not suffer serious loss. More important is the fact that the loans were advanced by the client only because the attorney promised her certain bonuses *which she exacted from him.* Here the inducement would appear not to be the 10 per cent profit promised but the assurances, repeated during the conversation . . . and thereafter, that it was a good investment for [his client] and

that she could get her money when she needed it." (Italics added.)

The facts in the present case are equally distinguishable from the *Wallis* case, where the former client was an experienced business woman engaged in the real estate business; here, petitioner's client was an elderly widow of moderate means and limited education; a bonus was offered by petitioner, not exacted by his client; the inducement was not the bonus offered by petitioner, but his assurance that his client would get her $1,000 back within 90 days. Petitioner knew his credit was exhausted and was aware of his client's concern for the safety of her money, yet he did not tell her that there was very little chance of his repaying the note in 90 days if, for reasons beyond his control, the escrow closing were further delayed.

Petitioner admittedly initiated the transaction, and whether he subjectively regarded it as a loan to him or an investment in him, he failed to fully and fairly disclose that the ultimate object of the investment was a temporary solution to his financial problems. He has not sustained his burden of showing that the transaction was "at arm's length" (*Krieger* v. *State Bar, supra*, 43 Cal.2d 604, 610 [4]), and the record amply supports the finding that he "used his position as an attorney for Mrs. Ragsdale and his knowledge of her lack of understanding of financial matters and her trust and confidence in him to obtain money from her fraudulently for his personal use without full, fair and truthful disclosure of the purpose for which the funds were to be used, and of his then existing financial condition which, if it had been disclosed, would have thwarted his purpose in acquiring these funds." (Finding V.)

Petitioner further misrepresented to his client that she had made a profit of $200 on her investment and that he would transmit the money to her in a few weeks when the necessary papers were prepared. While petitioner denied having said "we sold the place and you made $200," as Mrs. Ragsdale had testified, he did not deny that he told her that she would receive $1,200, saying: "Whether in that conversation or at the time she signed the will, I could not deny, and I will not deny, that I said to her that she would receive the $1,200, because I was still anticipating this to be done. She remembers it better than I. I apparently said that it would be four or five weeks, or three or four weeks, I don't know."

The trial committee heard and observed both witnesses and

believed Mrs. Ragsdale's testimony. This court has frequently said that it is proper to give great weight to the findings of the local administrative committee, which is in a better position than this court, with only the written record before it, to pass upon the truthfulness of the witnesses' testimony. (*Corn* v. *State Bar*, 68 Cal.2d 461, 466 [5] [67 Cal.Rptr. 401, 439 P.2d 313]; *McKinney* v. *State Bar*, 62 Cal.2d 194, 196 [5] [41 Cal.Rptr. 665, 397 P.2d 425]; *Brawner* v. *State Bar*, 48 Cal.2d 814, 818-819 [2] [313 P.2d 1]; *Werner* v. *State Bar*, 13 Cal.2d 666, 676-677 [91 P.2d 881].) There is no reason to upset the finding, made by both the trial committee and the disciplinary board, that Mrs. Ragsdale was informed by petitioner that the property in which she had invested her money had been sold, that she had earned $200, and that her money would be available to her in about four weeks. Such statements were false when made and were made for the purpose of deceiving her.

Between the rendition of the trial committee's findings, conclusions and recommendations and the hearing before the disciplinary board, petitioner was adjudged a bankrupt, and Mrs. Ragsdale had received a notice of a meeting of creditors. The State Bar examiner filed an application for the presentation of additional evidence in connection therewith. The board heard oral argument on said application and, contrary to petitioner's assertion in his petition for review that the board took the motion under submission but never ruled, the minutes of the board show that the application was denied. There is therefore no merit to the contention that this evidence was improperly produced before the disciplinary board.

Likewise without merit is petitioner's contention that the committee erred in not granting his motion to dismiss the proceedings at the close of the examiner's case on the ground that there was no evidence of any facts other than a transfer of money from Mrs. Ragsdale to petitioner and nonpayment of his note. The testimony of the complaining witness was uncontradicted, unimpeached, and was not inherently improbable. The trial committee therefore properly denied the motion to dismiss. Petitioner, after consultation with his counsel, then took the stand and testified in his own behalf.

The discipline recommended by the board is fair, just and appropriate. It has been uniformly held that the purpose of a disciplinary proceeding is not to punish the attorney but to inquire into the moral fitness of an officer of the court to continue in that capacity and to afford protection to the public, the courts and the legal profession. (*Hyland* v. *State*

152

*Bar,* 59 Cal.2d 765, 774 [4] [31 Cal.Rptr. 329, 382 P.2d 369];
*Best* v. *State Bar,* 57 Cal.2d 633, 637 [5] [21 Cal.Rptr. 589,
371 P.2d 325]; *Resner* v. *State Bar,* 53 Cal.2d 605, 613 [4] [2
Cal.Rptr. 461, 349 P.2d 67]; *In re Rothrock,* 16 Cal.2d 449,
454 [2] [106 P.2d 907, 131 A.L.R. 226]; *Marsh* v. *State Bar,* 2
Cal.2d 75, 79 [1] [39 P.2d 403].) ▆▆▆ Petitioner, in a lit-
tle over five years after he was admitted to practice, abused
the trust and confidence placed in him by an elderly, unedu-
cated woman of moderate means and in ill health to gain a
monetary advantage for himself. His intentional breach of his
fiduciary duty and his dishonest conduct in dealing with Mrs.
Ragsdale constitute acts of moral turpitude.

The board's findings and recommendations are fully sup-
ported and approved. It is therefore ordered that Thomas J.
Clancy be suspended from the practice of law in this state for
three years; that execution of our order be stayed and that he
be placed on probation for said three years upon condition
that he be actually suspended for the first six months; that he
refund to Mrs. Ethel Ragsdale the sum of $1,200 within said six
months and if he does not make said payment (and furnish
satisfactory evidence to the State Bar) the six months' period
of suspension be extended until said payment is made (and
satisfactory evidence thereof furnished to the State Bar) but
in no event to exceed three years; and that he comply with
other conditions of probation prescribed in the transcript of
the proceedings filed herein by the disciplinary board of the
State Bar. The probation period shall commence 30 days after
the filing of this order.